1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                     - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                     - - -

7    UNITED STATES OF AMERICA,        )
                                      )
8                    Plaintiff,       )
                                      )
9          vs.                        )   No. ED CR 08-00041(A)SGL
                                      )
10   JOEL STANLEY DREYER,             )
                                      )   CHANGE OF PLEA
11                   Defendant.       )
     _____)

12

13

             REPORTER'S TRANSCRIPT OF PROCEEDINGS

14

                   Riverside, California

15

                 Monday, September 21, 2009

16

                      2:16 P.M.

17

18

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
            Federal Official Court Reporter
24            3470 12th Street, Rm. 134
            Riverside, California  92501
25               (951) 274-0844
               WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2

 3   On Behalf of Plaintiff:

 4                           UNITED STATES ATTORNEYS' OFFICE
                             BY:  Antoine F. Raphael
 5                           Assistant U.S. Attorney
                             3880 Lemon Street
 6                           Suite 210
                             Riverside, California  92501
 7                           951-276-6210

 8

 9   On Behalf of Defendant:

10

11                           SNELL & WILMER
                             BY:  Wayne R. Gross
                             600 Anton Boulevard,
12                           Suite 1400
                             Costa Mesa, California  92626-7689
13                           714-427-7000

14

15   ALSO PRESENT:           Fred J. Grimm, FBI
                             John Nelson, Murrieta PD
16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2                                                    Page

3     CHANGE OF PLEA...................................   4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      Riverside, California; Monday, September 21, 2009; 2:16 P.M.

 2                          -oOo-

 3          THE CLERK:  Calling calendar item 17,

 4    Case Number ED CR 08-00041(A)-SGL, United States of America

 5    versus Joel Stanley Dreyer.                                    01:31

 6          May we have counsel please come forward and state

 7    your appearances for the record.

 8          MR. RAPHAEL:  Tony Raphael for the United States.

 9    With me at counsel table are FBI Special Agent Fred Grimm and

10    Detective John Nelson with the Murrieta Police Department.     02:16

11    Both of these gentlemen are investigators on this case,

12    Your Honor.

13          MR. GROSS:  Wayne Gross for Dr. Joel Dreyer.

14          THE COURT:  Good afternoon.

15          Dr. Dreyer, Joel Stanley Dreyer, is that your true     02:17

16    and correct name, sir?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  I understand you wish to enter a plea of

19    guilty today.

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  How old are you, sir?

22          THE DEFENDANT:  I'll be 72 in two weeks.

23          THE COURT:  I trust you've graduated from medical

24    school and know how to read and write, so I'll dispense with

25    those standard questions.                                      02:17
```

1          **THE DEFENDANT:**  Yes, Your Honor.

2          **THE COURT:**  Very well.

3          Is your mind clear today?

4          **THE DEFENDANT:**  I hope so, Your Honor.  Yes.

5          **THE COURT:**  Do you understand what's going on?          02:17

6          **THE DEFENDANT:**  Yes, I do.

7          **THE COURT:**  Are you under the influence of any

8   substance at all?

9          **THE DEFENDANT:**  Never.  And not today.

10          **THE COURT:**  All right.                                 02:17

11          I'm going to ask the court clerk to please swear you

12   in.

13          (Clerk gives oath to Defendant.)

14          **THE DEFENDANT:**  I do.

15          **THE COURT:**  I want to begin by asking counsel for the  02:17

16   government to set forth on the record the elements of the

17   offense.

18          Counsel?  Mr. Raphael?

19          **MR. RAPHAEL:**  Your Honor, in order for the Defendant

20   to be guilty of Count 1 of the first superseding indictment,     02:17

21   which charges a violation of Title 21, United States Code,

22   Section 846, the following must be true:

23          One, there was an agreement between two or more

24   persons to possess with the intent to distribute and to

25   distribute Oxycodone, a Schedule II controlled substance, in     02:18

violation of Title 21, United States Code, Sections 841(a)1 and (b)(1)(C);

Two, the Defendant became a member of the conspiracy knowing at least one of its objects and intending to help accomplish it;                                                                02:18

And, three, the Defendant, who at the time of the offense was a licensed physician in the state of California, committed the offense while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose.                                                02:18

In order for the Defendant to be guilty of Count 16 of the first superseding indictment, which charges a violation of Title 21, United States Code, Sections 841(a)1 and (b)(1)(C); and Title 18, United States Code, Section (2)(B), the following must be true:                                                    02:19

One, the Defendant knowingly caused the intentional and unlawful distribution and dispensing of Oxycodone, a Schedule II controlled substance;

Two, the Defendant knew it was Oxycodone or some other prohibited drug;                                                        02:19

And, three, the Defendant, who at the time of the offense was a licensed physician in the state of California, committed the offense while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose.                                                02:19

1          **THE COURT:**  Doctor, do you admit that you are guilty

2   of these two offenses?

3          **THE DEFENDANT:**  Okay, Your Honor.

4          **THE COURT:**  Do you understand the elements that the

5   government just described?                                      02:19

6          **THE DEFENDANT:**  I do.

7          **THE COURT:**  And are those the offenses to which you

8   wish to plead guilty?

9          **THE DEFENDANT:**  Yes, Your Honor.

10         **THE COURT:**  What is the maximum penalty that the      02:20

11  Defendant faces for a conviction under these two offenses?

12         **MR. RAPHAEL:**  The statutory maximum sentence that the

13  Court can impose for a violation of Title 21, United States

14  Code, Section 846, is 20 years imprisonment; a lifetime period

15  of supervised release; a fine of $1 million, or twice the gross  02:20

16  gain or gross loss resulting from the offense, whichever is

17  greater; and a mandatory special assessment of $100.

18         The statutory maximum sentence that the Court can

19  impose for a violation of Title 21, United States Code,

20  Sections 841(a)1 and (b)(1)(C) is 20 years imprisonment; a      02:20

21  lifetime period of supervised release; a fine of $1 million, or

22  twice the gross gain or gross loss resulting from the offense,

23  whichever is greater; and a mandatory special assessment of

24  $100.

25         Therefore, the total maximum sentence for all of the     02:20

1   offenses to which the Defendant is pleading guilty to is

2   40 years imprisonment; a lifetime period of supervised release;

3   a fine of $2 million, or twice the gross gain or gross loss

4   resulting from the offense, whichever is greater; and a

5   mandatory special assessment of $200.                          02:21

6           Supervised release is a period of time following

7   imprisonment during which the Defendant will be subject to

8   various restrictions and requirements.  If the Defendant

9   violates one or more of the conditions of any supervised

10  release imposed, the Defendant may be returned to prison for    02:21

11  all or part of the term of supervised release, which could

12  result in the Defendant serving a total term of imprisonment

13  greater than the statutory maximum, which is 40 years in this

14  case.

15          **THE COURT:**  Do you understand the maximum penalty?    02:21

16          **THE DEFENDANT:**  I do, Your Honor.

17          **THE COURT:**  Very well.

18          Before accepting your plea of guilty, I need to make

19  sure that you understand your constitutional rights, and that

20  you also understand that by pleading guilty, you'll be giving   02:22

21  up those constitutional rights.

22          You have the right to persist in a plea of not

23  guilty.  You have the right to a speedy and public trial by

24  jury.  You have the right to the assistance of counsel at all

25  stages of these proceedings, including the right to have this   02:22

1    Court appoint counsel to represent you if you cannot afford

2    counsel.

3              You have the right to be presumed innocent and to

4    have the burden of proof placed on the government to prove your

5    guilt beyond a reasonable doubt.  You have the right to          02:22

6    confront and cross-examine any witnesses against you; the

7    right, if you so wish, to testify on your own behalf and

8    present evidence in opposition to the charges, including the

9    right to call witnesses and to subpoena those witnesses to

10   testify.                                                         02:22

11             You have the right not to be compelled to testify,

12   and if you choose not to testify or present evidence, to have

13   that choice not be used against you.

14             By pleading guilty, you'll also be giving up any and

15   all affirmative defenses, any Fourth or Fifth Amendment claims,  02:22

16   or any other pretrial motions that have been brought or could

17   have been brought.

18             Do you understand that?

19             **THE DEFENDANT:**  I do, Your Honor.

20             Could I have a few more minutes with my counsel?       02:23

21             **THE COURT:**  Yes.

22             **THE DEFENDANT:**  Thank you.

23             (Sotto voce discussion occurs between

24             Defendant and Counsel outside the courtroom.)

25             **THE COURT:**  Mr. Gross?                             02:26

1        **MR. GROSS:**  At this point, I'd request some

2    additional time.

3        **THE COURT:**  Do you need more time today, or would you

4    like to continue this to another date?

5        **MR. GROSS:**  I think we can probably do it this                    02:26

6    afternoon, if Your Honor doesn't mind.

7        **THE COURT:**  Very well.

8        Mr. Raphael, I understand you have another matter.

9        **MR. RAPHAEL:**  I have two other matters before this

10   Court here today, Your Honor, and then a 3:30 matter before

11   Judge Phillips.

12       **THE COURT:**  Oh, are we ready?

13       **THE DEFENDANT:**  We're ready, Your Honor.

14       **THE COURT:**  Very good.

15       Do you understand your constitutional rights?

16       **THE DEFENDANT:**  Yes, Your Honor.  And I apologize for

17   taking a few minutes with so much going on.

18       **THE COURT:**  No worries at all.

19       You've had enough time now?

20       **THE DEFENDANT:**  I believe so.                                     02:27

21       **THE COURT:**  Okay.

22       You do understand those constitutional rights.

23       You also understand that by pleading, you'll be

24   giving up those rights; is that correct?

25       **THE DEFENDANT:**  I understand.                                     02:27

1          **THE COURT:**  Okay.

2          I'm now going to talk about the factual basis for

3    this plea.

4          I want you to begin by telling me what you did to be

5    guilty of this offense.                                    02:27

6          **THE DEFENDANT:**  Well, I'll be glad to, Your Honor.

7          The only thing that I'm aware of that I did -- and I

8    want to share that with you -- I've been practicing,

9    Your Honor, since 1967, before most people in this room were

10   born.  I haven't had an auto accident.  I have no tickets.   02:27

11   I've never had a complaint; I've seen thousands and thousands

12   of patients.  I ran the Malibu Drug Clinic.  I ran a clinic in

13   Pomona.  No complaints.  No malpractice suits.

14         The things I did was, I did go to Mexico for probably

15   17 months, once a week, and see patients.  But the son of the   02:28

16   lady attorney general was my interpreter.  I assumed, because I

17   don't -- very pequeño español -- I assumed the patient that

18   came in to see me was telling the truth through the

19   interpreter.  So if they complained of pain, I ordered a

20   script.                                                    02:28

21         And, yes, I ordered scripts, but I never ever once --

22   I was never a Dr. Murray in the Michael Jackson case.  I was

23   never somebody in the Anna Nicole Smith.  I never once gave a

24   drug greater than what was the required amount.  I never once

25   gave a drug within 30 days again.  In other words, you've      02:28

1    got -- once a month, you got a certain amount.  That's a fact,

2    Your Honor.

3            However, it is true that I never did know for sure

4    what those patients said; that's probably bad.

5            Second bad:  Because I was running Oak Grove

6    Institute as a medical director for 15 years -- Stuart Bloom,

7    by the way, the president -- while I'm talking to you, I'm so

8    sad; he's a good friend -- is right now undergoing surgery for

9    pancreatic cancer -- during the time I was at Oak Grove, I

10   didn't have much time, because I was working with the kids; but

11   I still would see patients that had problems with their pain

12   symptoms or their mental illness.  And sometimes I would see

13   them in a restaurant instead of at Dr. Govatz's office, because

14   he had his office only a couple of nights from me, so the other

15   time I might see somebody in a pizza parlor or a Chinese

16   restaurant.  That's certainly not a great idea, but I still

17   took notes, saw the patient, wrote a script; never wrote over

18   the proper amount, and never wrote more than once a month.

19           So what did I do wrong?  My judgment wasn't good,

20   seeing patients in a pizza parlor, a Chinese restaurant, going

21   to Mexico.  I bailed my ex-wife out of jail twice.  She was

22   using speed.  I knew about it.  I put her in rehab twice.  I

23   trained the people that run the Malibu famous clinic,

24   Ritchie Tate.  And, Your Honor, she's in prison now for drug

25   dealing and drug use, but I had nothing to do with that either.

1    In fact, I bailed her out of jail twice.  I was humanitarian of

2    the year in Michigan in 1984.  I went to Nicaragua with a

3    million dollars worth of goods to deliver to kids, Your Honor.

4    I'm just not this bad guy I'm being painted out to be.

5            In answer to your question what I did wrong:  My                    02:30

6    judgment.  I went to Daniel Amen's clinic.  He's famous.  He

7    was on Larry King, the Dr. Drew show.  He has an office in

8    Newport Beach, Fairfield, Louisiana, and Kentucky.  And

9    Dr. Amen did a brain scan on me and he found that in my frontal

10   lobe, Your Honor -- and I've got the scans; they're available           02:31

11   to the attorneys -- I have brain damage.  I have three holes in

12   the frontal lobe of my brain.  That doesn't affect my memory or

13   my concentration, my ability to think.  Two things happen.  You

14   can look it up on the computer.  Lack of sense of smell.  My

15   daughter, my beautiful daughter, would say, 'Dad, the dog              02:31

16   pooped; the cat pooped.'  I didn't smell it.  And a lack of

17   judgment.

18           So I married an ex-Olympic figure skater, drug user;

19   went to Mexico; saw patients that I didn't know, probably,

20   everything they were telling me, Your Honor; saw patients in           02:31

21   pizza parlors.

22           But did I know the drugs were being delivered on the

23   street?  No.  Did I make any profit off of it?  No.  Did I get

24   $100 a script like the newspapers said, *L.A. Times*,

25   *Press Enterprise*?  No.  I got $100 if I gave them four scripts,      02:32

 1    one script, or no script; that was for the visit, like doctors

 2    do.

 3         Did I do a physical exam?  No.  I haven't done a

 4    physical exam since 1963.  Look it up on the computer.

 5    Psychiatrists don't do physical exams.                        02:32

 6         And I'm so appreciative that you're giving me the

 7    opportunity to tell you what's true and not the BS.

 8         And that is the truth.  Bad judgment, Your Honor.

 9         **THE COURT:**  I'm also going to ask the government to

10    set forth what they believe the evidence would show at trial.  02:32

11         **THE DEFENDANT:**  Okay.

12         **THE COURT:**  And I'm going to ask you to carefully

13    listen to everything that Mr. Raphael says.  At the end of it,

14    I'm going to be asking you two questions.

15         First, I'm going to ask you whether everything he        02:32

16    said is true or not.

17         **THE DEFENDANT:**  Good.

18         **THE COURT:**  And, second, I'm going to ask you if

19    there was anything at all that he said that you object to.

20         If you want to stop, let your attorney know; because     02:32

21    it's a long factual statement that you've incorporated into the

22    plea agreement, which I trust he's going to be reading from; so

23    let me know.  But those are the two questions I'm going to ask

24    you.  Okay?

25         **THE DEFENDANT:**  I really appreciate this, Your Honor.  02:33

1    Thank you.

2            **THE COURT:**  Mr. Raphael, before we get to that, a

3    copy of the plea agreement I have cuts off on Page 21, in the

4    middle of the factual basis, what I actually hope is towards

5    the end of the factual basis.                                    02:33

6            Is it complete on your page?

7            **MR. RAPHAEL:**  Your Honor, I have two copies.  I have

8    a copy that has all of the pages -- and I apologize,

9    Your Honor, it sounds like the copy that was lodged does have

10   some missing pages -- the last few pages missing, which goes    02:33

11   all the way to 23.

12           **THE COURT:**  To 23?

13           **MR. RAPHAEL:**  Yes.

14           **THE COURT:**  I'm missing from Page 21, the middle of

15   it, on.                                                          02:34

16           Mr. Gross, does your copy have all of the pages?

17           **MR. GROSS:**  Yes, Your Honor.

18           **MR. RAPHAEL:**  Your Honor, I do have the full --

19           **THE COURT:**  Mr. Raphael, is this full eight-page

20   novel necessary, or can you set forth what the evidence would   02:34

21   show if this case were to go to trial?

22           **MR. RAPHAEL:**  Your Honor, it is necessary,

23   especially, I submit to the Court, in light of what the

24   Defendant just said to the Court as to what he did, especially

25   considering that we do dispute a lot of what he said today in   02:34

```
 1    front of the Court as to what he did and his role and what he

 2    knew.

 3              THE COURT:  Mr. Gross, do you have the entire --

 4              MR. GROSS:  I do.

 5              THE COURT:  You do.  Well, the Court doesn't.              02:34

 6              What I'd like to do is -- why don't you get that

 7    corrected, Mr. Raphael.  We're going to take up a few other

 8    matters, and then we'll come back to this.  I'd like to have a

 9    complete plea agreement in front of me as we go through this.

10              MR. RAPHAEL:  Sure, Your Honor.                           02:35

11              THE COURT:  Doctor, we're going to take this matter

12    up after I get a full copy of the plea agreement.

13              THE DEFENDANT:  Will that happen today, Your Honor?

14              THE COURT:  Yes.  Mr. Gross will explain it to you.

15              (Other cases called.)                                    02:35

16              THE COURT:  Dr. Dreyer, if you would return now,

17    please.

18              THE DEFENDANT:  Yes, Your Honor.

19              THE CLERK:  Recalling calendar item 17, Case Number

20    ED CR 08-00041-SGL, United States of America versus              03:04

21    Joel Stanley Dreyer.

22              THE COURT:  Where we left off on this is, I had just

23    asked the U.S. attorney to set forth on the record the factual

24    basis.

25              MR. RAPHAEL:  Your Honor, I do apologize for the         03:04
```

Monday, September 21, 2009                              ED CR 08-00041(a)SGL

1   missing pages.

2         **THE COURT:**  No worries.

3         **MR. RAPHAEL:**  Also, for the length of the factual

4   basis.  But in light of the sort of contested facts in this

5   case, Your Honor, the government feels it's prudent to have the    03:04

6   detailed factual basis in this case.

7         **MR. GROSS:**  Your Honor, may I just have one moment

8   with Mr. Raphael.

9         **THE COURT:**  We're going to take a two-minute recess,

10  and you can have that moment.                                      03:04

11        **THE CLERK:**  Court is in recess.

12        (Brief recess.)

13        **THE COURT:**  Are we all ready?

14        Mr. Gross?

15        **MR. GROSS:**  Yes, Your Honor.

16        **THE COURT:**  Mr. Raphael?

17        **MR. RAPHAEL:**  Yes, Your Honor.

18        **THE COURT:**  And Dr. Dreyer?

19        **THE DEFENDANT:**  Yes.

20        **THE COURT:**  Listen carefully to what he has to say    03:10

21  here.

22        **THE DEFENDANT:**  I will, Your Honor.

23        **THE COURT:**  Mr. Raphael.

24        **MR. RAPHAEL:**  Your Honor, if this case were to

25  proceed to trial, the government would prove the following        03:10

1    beyond a reasonable doubt:

2         The first part of the factual basis is with regard to

3    the conspiracy with Mitchell Garrett Howard and others.

4         From at least on or about May of 2004, and continuing

5    to on or about December of 2005, in Riverside County, within          03:10

6    the Central District of California and elsewhere, the Defendant

7    conspired and agreed with co-defendant Mitchell Garrett Howard,

8    or "Howard," and others, to knowingly and intentionally possess

9    with the intent to distribute and to distribute Oxycodone, a

10   Schedule II controlled substance.                                      03:10

11        The Defendant committed this offense while acting and

12   intending to act outside the usual course of professional

13   practice and without a legitimate medical purpose.

14        As part of this conspiracy, Howard would recruit

15   individuals to obtain prescriptions for Oxycodone.  The               03:11

16   Defendant would write the prescriptions for Oxycodone for the

17   recruited individuals without conducting a legitimate medical

18   exam on the individuals.  The Defendant would receive payments

19   of between $100 to $200 inclusive for each prescription of

20   Oxycodone that Defendant wrote.                                       03:11

21        The Defendant and Howard also recruited a courier,

22   whose initials are C.D., to go to pharmacies and fill some of

23   the Oxycodone prescriptions that Defendant wrote.  C.D. would

24   obtain the Oxycodone pills from pharmacies and deliver the

25   Oxycodone pills to Howard.  Howard would sell the Oxycodone          03:11

1  pills to unindicted co-conspirator A, who operated a pharmacy

2  in Tijuana, Mexico.

3          As part of this conspiracy, the Defendant wrote

4  prescriptions and caused the illegal distribution and

5  dispensing of the following Oxycodone pills:                    03:11

6          16,638 pills of 80-milligram Oxycodone; 2,040 pills

7  of 40-milligram Oxycodone; 840 pills of 30-milligram Oxycodone;

8  470 pills of 10-milligram Oxycodone; 90 pills of 5-milligram

9  Oxycodone.

10          Next is the factual basis for Defendant's practice of   03:12

11  illegally prescribing drugs outside of the conspiracy with

12  Howard.

13          In addition to the conspiracy with Howard and others

14  to distribute Oxycodone, the Defendant also illegally

15  prescribed drugs such as Oxycontin and Percocet; Oxycontin and  03:12

16  Percocet are brand names of the drug Oxycodone -- Norco,

17  Vicodin, Lortab; Norco, Vicodin, and Lortab are brand names of

18  the drug Hydrocodone -- and Xanax; Xanax is the brand name of

19  the drug of Alprazolam.

20          Specifically, the Defendant would prescribe these       03:13

21  drugs without conducting physical examinations.

22          In committing these offenses, the Defendant was

23  acting and intending to act outside the usual course of

24  professional practice and without a legitimate medical purpose.

25          The Defendant also illegally prescribed drugs to        03:13

```
1    undercover law enforcement agents.

2           On February 6, 2007, a female DEA special agent,

3    acting in an undercover capacity as UC-1, made contact with the

4    Defendant at his office location, 40485 Murrieta Hot Springs

5    Road, Number B-7, in Murrieta, California.  This location is        03:13

6    the Alta Murrieta Chiropractic Center.  UC-1 was wearing a body

7    recording device, and her interaction with Defendant was

8    recorded and monitored by law enforcement personnel.

9           UC-1 met Defendant in his office where Defendant

10   utilized a small room to meet with patients one day per week.       03:14

11   Upon meeting, Defendant shook UC-1's hand and mentioned for

12   UC-1 to sit down.  UC-1 noticed the office was small,

13   approximately eight-by-eight feet, with two chairs in front of

14   a desk, one chair behind a desk, and a bookcase.  UC-1 did not

15   observe any medical equipment of any kind, such as a             03:14

16   stethoscope or a blood pressure cuff.  Defendant was initially

17   on the phone.  Defendant hung up the phone and asked UC-1 her

18   name.  Defendant then started to fill out paperwork on his

19   desk, asking UC-1 how to spell her name, first and last, along

20   with UC-1's date of birth.  Defendant asked UC-1 why she was       03:14

21   there to see a shrink.  UC-1 stated her boyfriend was in the

22   week before and that he, her boyfriend, said she could come in

23   and see the Defendant.  Defendant asked if she was there for

24   her boyfriend and UC-1 responded "Yes."  Defendant then asked

25   why the boyfriend was not there himself.  UC-1 responded that      03:15
```

his prescription was recent.  He asked for the last name of
UC-1's boyfriend.

Defendant then asked UC-1 if she was in pain, then
without waiting for a response, asked her what prescription her
boyfriend received.  UC-1 responded "Xanax and Vicodin."                    03:15
Defendant asked if that was what she wanted, and UC-1
responded "Yes."  Defendant then asked UC-1 why she was having
pain.  UC-1 responded "Cramps?" as a question.  The Defendant
laughed and UC-1 observed Defendant write "Cramps" as the
diagnosis on the paper that he originally filled out with                   03:15
UC-1's general information.  Defendant stated he could fill the
prescription for UC-1, but implied under normal circumstances,
he would not do that.  Defendant asked UC-1 if she had any
panic attacks, and UC-1 responded "No."

Defendant then stated it would be $100.  UC-1 asked         03:16
Defendant how soon she could come back.  Defendant stated,
"A month; there's no option, unless you want to go out with me
every night."  UC-1 responded that her boyfriend wouldn't like
that.  UC-1 then inquired about having a girlfriend come in to
get a prescription.  Defendant stated only if the girlfriend            03:16
was real and she had a real problem.  Defendant stated it would
look bad.  UC-1 observed Defendant write out the prescription
for Vicodin and Xanax and then handed it to her.  Defendant
requested the standard $100 fee for the prescription, and UC-1
gave the money to Defendant.  UC-1 inquired where she could             03:16

1   fill the prescription.  Defendant stated she could fill it

2   anywhere but Costco in America.  UC-1 then asked if she would

3   have to come back to the office a second time if she needed a

4   refill on her prescription.  Defendant answered "Yes."  UC-1

5   later filled the prescription written by the Defendant.          03:16

6           On April 10, 2007, UC-1 attempted to make another

7   purchase from Defendant at his office location.  UC-1 wore a

8   body recording device, and the interaction was monitored by law

9   enforcement personnel involved with the investigation.

10          UC-1 entered Defendant's office; and, once again,        03:17

11  UC-1 did not observe any medical office equipment of any kind.

12  Defendant entered the office and greeted UC-1 by saying,

13  "How's my girl?"  Defendant told UC-1 that she looked great and

14  asked her for her date of birth.  Defendant asked UC-1, "What

15  is the story today?"  UC-1 asked for Percocet, a brand name for  03:17

16  Oxycodone.  Defendant then called in the 30-tablet Percocet

17  prescription to Bear Creek Pharmacy.  Defendant told the

18  pharmacist that UC-1 would be coming to the pharmacy and that

19  "she's a cutey."  UC-1 paid Defendant the standard $100 and

20  exited the office.  UC-1 later picked up the Percocet            03:17

21  prescription from the Bear Creek Pharmacy.

22          This was the second office visit by UC-1.  And,

23  again, Defendant did not conduct any type of physical

24  examination before prescribing the medication.

25          As part of Defendant's practice of illegally            03:18

1   prescribing drugs, he caused the intentional and unlawful

2   distribution and dispensing of prescription drugs, including

3   the following:

4           10,876 pills of 80-milligram Oxycodone; 6,870 pills

5   of 40-milligram Oxycodone; 68,122 pills of 10-milligram                03:18

6   Oxycodone, or Norco; 93 pills of 20-milligram hydrocodone;

7   130 pills of 2-milligram hydrocodone; 120 pills of

8   7.5-milligram hydrocodone; 9,616 pills of 7.5-milligram

9   hydrocodone; 842 pills of 5-milligram hydrocodone; 840 pills of

10  12-milligram Fentanyl, also known as Actiq; 30,061 pills of         03:19

11  2-milligram Alprazolam, also known as Xanax; 1,454 pills of

12  1-milligram Alprazolam, also known as Xanax; 330 pills of

13  .5-milligram Alprazolam, also known as Xanax; 30 pills of

14  10-milligram Alprazolam, also known as Xanax.

15          The total pills prescribed and caused to be                  03:19

16  distributed and dispensed by the Defendant are as follows:

17          As part of the conspiracy with Howard and his own

18  practice of illegally prescribing drugs, Defendant knowingly

19  and intentionally caused the intentional and unlawful

20  distribution and dispensing of the following drugs:                 03:19

21          27,214 pills of 80-milligram Oxycodone; 8,910 pills

22  of 40-milligram Oxycodone; 840 pills of 30-milligram Oxycodone;

23  470 pills of 10-milligram of Oxycodone; 90 pills of 5-milligram

24  Oxycodone; 68,122 pills of 10-milligram hydrocodone; 93 pills

25  of 20-milligram hydrocodone; 130 pills of 2-milligram               03:20

```
 1    hydrocodone; 120 pills of 7.5-milligram hydrocodone; 9,616
 2    pills of 7.5-milligram hydrocodone; 842 pills of 5-milligram
 3    hydrocodone; 840 pills of 12-milligram Fentanyl; 37,061 pills
 4    of 2-milligram Alprazolam; 1,454 pills of 1-milligram
 5    Alprazolam; 330 pills of .5-milligram Alprazolam; 30 pills of      03:20
 6    10-milligram Alprazolam.
 7              In prescribing all of these drugs, the Defendant
 8    acted and intended to act outside the usual course of
 9    professional practice and without a legitimate medical purpose.
10              Oxycodone and Fentanyl are both Schedule II            03:21
11    controlled substances.  Hydrocodone is a Schedule III
12    controlled substance.  Alprazolam is a Schedule IV controlled
13    substance.
14         THE COURT:  Thank you, counsel.
15         I told you I'd ask you two questions.                       03:21
16         The first is, is that all true?
17         THE DEFENDANT:  True, Your Honor.  Now that I know
18    the fact that I've been told that if I know it now to be true,
19    it's true.  And I know it now to be true.
20         THE COURT:  Okay.  So you're saying that everything         03:21
21    in here is true?
22         THE DEFENDANT:  Well, for instance --
23         THE COURT:  Let me phrase it another way.
24         Is there anything in here that you believe to be
25    false?                                                           03:21
```

 1          **THE DEFENDANT:**  Yes.

 2          The sentence on Page 18, where it says, "Howard would

 3   sell the Oxycodone pills to unindicted co-conspirator A, who

 4   operated a pharmacy in Tijuana, Mexico," I had no clue that was

 5   going on whatsoever.  But the prosecuting attorney said, 'But          03:22

 6   you now know it's true, so you can accept it's true now'; and I

 7   said, 'That's fine, if it's true, but I didn't know it was true

 8   ahead of time.'

 9          **THE COURT:**  Do you believe it to be true now?

10          **THE DEFENDANT:**  Yeah, probably, because I know Mitch      03:22

11   made a lot of money, and you gotta get it somewhere.

12          **THE COURT:**  Okay.

13          Any other lines that you object to?

14          **THE DEFENDANT:**  Well, the other one I told you about

15   in my speech, that I only got $100; not $100 per script, but       03:22

16   $100 per visit.

17          **THE COURT:**  Because there are allegations that it was

18   between $100 and $200.

19          **THE DEFENDANT:**  And that isn't true.  And it was

20   allegations of $100 per script.  That's not true.                  03:22

21          **THE COURT:**  Okay.

22          **THE DEFENDANT:**  And the third thing is that -- so

23   that was the scripts.

24          The last sentence, that I 'acted outside the course

25   of professional practice', I told you that psychiatrists do not    03:22

1   do physical exams; so that is within the course of what every

2   psychiatrist believes to be normal practice.

3          **THE COURT:**  You're referring to the failure to do a

4   physical exam?

5          **THE DEFENDANT:**  Yes, Your Honor.  Only.          03:23

6          **THE COURT:**  But there's other aspects in here in

7   which you did act outside the course of the medical profession?

8          **THE DEFENDANT:**  Well, it's alleged so, yes.

9          **THE COURT:**  Mr. Raphael?

10         **MR. RAPHAEL:**  Your Honor, as part of this plea, the   03:23

11  Defendant must admit that in illegally prescribing the pills

12  that we listed in our factual basis, he was acting outside the

13  usual course of professional practice and without a legitimate

14  medical purpose.  If he cannot admit to that, then we have no

15  plea.                                                        03:23

16         **THE COURT:**  Doctor?

17         No one is forcing you to take a plea.  If this is not

18  true, tell me it's not true, and we'll deal with this on

19  another day.

20         **THE DEFENDANT:**  Well, Your Honor, again, the key    03:23

21  words are "outside the normal practice."

22         **THE COURT:**  It's "the usual course of professional

23  practice."

24         **THE DEFENDANT:**  I don't think I was in the usual

25  course, as I told you in my speech earlier.  But six years ago,  03:23

 1    I had an ilio rupture and cardiac arrest and brain damage.  I'm

 2    a doctor, but I didn't know it caused brain damage.

 3         **THE COURT:**  Well, we're going to be addressing all of

 4    those issues at the time of sentencing.

 5         The question now is --                                   03:24

 6         **THE DEFENDANT:**  Yes, Your Honor.  I accept it, yes.

 7         **THE COURT:**  -- the conduct.

 8         So you were, in fact, acting outside the course of

 9    professional practice and without a legitimate medical purpose.

10         Is that true?                                            03:24

11         **THE DEFENDANT:**  Probably, yes.

12         **THE COURT:**  If you are not sure, Doctor, this is the

13    time -- you have not admitted to anything at this point.

14         Why don't you just talk to Mr. Gross for a moment.

15         **THE DEFENDANT:**  Well, I know, Your Honor, that I      03:24

16    didn't do what my peers did; so it wasn't the usual -- all the

17    words of "usual practice," I agree, that I was acting outside

18    the normal, usual practice.

19         **THE COURT:**  Okay.

20         And without a legitimate medical purpose.                03:24

21         **THE DEFENDANT:**  Well, I always thought that the

22    person talking to me had a problem.

23         I'm very outgoing, Your Honor.  When I said, 'You're

24    a cutey pie, and I'd take you out every day' -- I've never

25    touched or taken out a client in my whole life.  I just happen  03:25

```
 1    to be very open.  But I'm sure that's not standard either.
 2            THE COURT:  Doctor, I'm not interested in --
 3            THE DEFENDANT:  I know that, Your Honor.
 4            THE COURT:  If you're not guilty, you're not guilty;
 5    and we'll go to trial.                                          03:25
 6            Mr. Gross, what I'm getting right now is
 7    equivocation.
 8            MR. GROSS:  May I have 30 seconds?
 9            THE COURT:  Yes.  Please.
10            (Sotto voce discussion occurs
11             between Defendant and counsel.)
12            THE DEFENDANT:  Okay.  I accept the plea, Your Honor.
13            THE COURT:  It's not a matter of accepting the plea.
14    I need to make sure that there is a factual basis for the plea.
15            Were you acting outside the usual course of medical     03:25
16    profession?
17            THE DEFENDANT:  I would say yes, Your Honor.
18            THE COURT:  And I'm also asking you, was there a
19    legitimate medical purpose for these various prescriptions?
20    Yes or no?                                                      03:26
21            THE DEFENDANT:  Probably not, Your Honor.
22            THE COURT:  That's the impression I'm getting, but I
23    need more than a "probably not."
24            If there's not, there's not.  If there is, there is.
25            THE DEFENDANT:  I'll accept the full guilty plea,       03:26
```

1    Your Honor; and I'll stand in your judgment.

2         **THE COURT:**  Right.  But I'm not going to deal in

3    conclusions here.  I need to know -- the government has alleged

4    that the evidence will show at trial that there was no

5    legitimate medical purpose for these prescriptions.                    03:26

6         My question to you is, is that statement true, or is

7    it not true?

8         **THE DEFENDANT:**  True.

9         **THE COURT:**  Is there anything further from the

10   government at this time?                                               03:27

11        **MR. RAPHAEL:**  Your Honor, may I have a moment?

12        **THE COURT:**  You may.

13        (Brief off-the-record discussion.)

14        **THE DEFENDANT:**  I appreciate your time, Your Honor.

15        **THE COURT:**  No worries.                                       03:27

16        **MR. RAPHAEL:**  That's fine, Your Honor.  Nothing

17   further from the government.

18        **THE COURT:**  Mr. Gross, anything further from the

19   defense?

20        **MR. GROSS:**  No, Your Honor.                                   03:27

21        **THE COURT:**  All right.

22        Let's continue with the plea agreement.  I have a

23   plea agreement before me, Doctor, which has what appears to be

24   your signature on Page 16.

25        **THE DEFENDANT:**  That is my signature, Your Honor.             03:27

1          **THE COURT:**  Not 16.

2          **THE DEFENDANT:**  17.

3          **THE COURT:**  17, yes.

4          Is that your signature?

5          **THE DEFENDANT:**  Yes, it is.  That's my signature.          03:27

6          **THE COURT:**  It looks like a doctor's signature.

7          **THE DEFENDANT:**  That's why I smiled.

8          **THE COURT:**  Does your signature indicate that you

9   read and understand the plea agreement?

10         **THE DEFENDANT:**  Yes, Your Honor.          03:28

11         **THE COURT:**  All right.

12         Specifically, on Page 6, beginning on Page 6, there's

13  a discussion of sentencing factors.

14         Has your attorney explained to you the sentencing

15  factors that the Court must consider before imposing sentence?          03:28

16         **THE DEFENDANT:**  Yes.

17         **THE COURT:**  Specifically, has he explained to you the

18  role of the U.S. sentencing guidelines in the determination of

19  a sentence?

20         **THE DEFENDANT:**  Yes, Your Honor.          03:28

21         **THE COURT:**  All right.

22         Turning to Page 14, there is a discussion of a

23  limited mutual waiver of appeal on collateral attack.

24         Has Mr. Gross explained those provisions to you?

25         **THE DEFENDANT:**  Yes, Your Honor.          03:29

```
 1              THE COURT:  Have you had sufficient time with
 2    Mr. Gross?
 3              THE DEFENDANT:  I believe so, Your Honor.
 4              THE COURT:  Have you told him everything you know
 5    about this case?                                              03:29
 6              THE DEFENDANT:  I believe so, Your Honor.
 7              THE COURT:  And you're satisfied with his
 8    representation?
 9              THE DEFENDANT:  Yes, Your Honor.
10              THE COURT:  Very well.                              03:29
11         Mr. Gross, have you had sufficient time with your
12    client?
13              MR. GROSS:  I have, Your Honor.
14              THE COURT:  Do you believe that he understands the
15    plea agreement?                                              03:29
16              MR. GROSS:  I do, Your Honor.
17              THE COURT:  And you believe this plea is in his best
18    interest?
19              MR. GROSS:  I do, Your Honor.
20              THE COURT:  I should add, Doctor, in signing the plea  03:29
21    agreement, part of the plea agreement and incorporated into the
22    plea agreement is the factual basis that was read by the
23    government into the record, except for the objection to the
24    amount of payment that you would receive; namely, that it's
25    $100 and not $100 to $200, or $100 a script.                 03:29
```

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  You otherwise accept that factual

3     statement as being accurate; correct?

4          THE DEFENDANT:  Yes, Your Honor.

5          And also the fact that I had no awareness there was          03:29

6     monies going to Mitch Howard from --

7          THE COURT:  Right.  You had no contemporary

8     awareness --

9          THE DEFENDANT:  Right.  And no money.

10          THE COURT:  Okay.  Very well.          03:30

11          But otherwise, everything in that statement is

12     accurate?

13          THE DEFENDANT:  Otherwise, we're on the go.

14          THE COURT:  All right.

15          Are you pleading guilty voluntarily?          03:30

16          THE DEFENDANT:  I'm here, Your Honor.

17          THE COURT:  Are you pleading guilty voluntarily?

18          THE DEFENDANT:  I am, Your Honor.

19          THE COURT:  Has anyone forced you to plead guilty?

20          THE DEFENDANT:  No, Your Honor.          03:30

21          THE COURT:  Has anyone made any promises to get you

22     to plead guilty?

23          THE DEFENDANT:  I wish they could.

24          No, Your Honor.

25          THE COURT:  Has anyone made any threats to get you to          03:30

```
 1   plead guilty?

 2            THE DEFENDANT:  No, Your Honor.

 3            THE COURT:  Very well.

 4            You're pleading guilty because you are, in fact,

 5   guilty and for no other reason; is that correct?              03:30

 6            THE DEFENDANT:  Yes, Your Honor.

 7            THE COURT:  With respect to Count 1 of the

 8   indictment, which charges you with engaging in a conspiracy

 9   with two or more persons to possess with the intent to

10   distribute and to distribute Oxycodone, a Schedule II         03:30

11   controlled substance, how do you plead?  Guilty or not guilty?

12            THE DEFENDANT:  Guilty.

13            THE COURT:  With respect to Count 16 of the first

14   superseding indictment, which charges you with a violation of

15   Title 21, U.S. Code, Section 841, and that is for --          03:31

16            I assume that's possession with the intent to

17   distribute, Mr. Raphael?

18            MR. RAPHAEL:  Yes, Your Honor.

19            THE COURT:  -- with possession with the intent to

20   distribute Oxycodone, how do you plead?  Guilty or not guilty? 03:31

21            MR. RAPHAEL:  I'm sorry.  This is actual

22   distribution.

23            THE COURT:  The actual distribution.  All right.

24            -- to the distribution of Oxycodone, how do you

25   plead?  Guilty or not guilty?                                 03:31
```

```
 1            THE DEFENDANT:  Guilty.

 2            THE COURT:  Very well.

 3            THE DEFENDANT:  I wrote the scripts, Your Honor.

 4            THE COURT:  Okay.

 5        So that's guilty to Count 1 of the first superseding      03:31

 6   indictment and guilty to Count 16 of the first superseding

 7   indictment.

 8            The Court will accept the two pleas of guilt to those

 9   two counts.  I'll find that it's knowingly and intelligently

10   made; that Dr. Dreyer understands the elements of each of those  03:31

11   offenses and the consequences of pleading guilty; that he

12   understands his constitutional rights and waives or gives up

13   those rights by pleading guilty.

14            I'll find that there's a factual basis to support the

15   plea of guilt and that the plea is being made voluntarily,     03:32

16   without any threats or promises.

17            The matter is referred to the U.S. probation office

18   for the preparation of a presentence investigation and report.

19            We'll set a sentencing date.

20            THE CLERK:  December 7, 2009, at 2:00 p.m.            03:32

21            MR. GROSS:  We had actually talked about moving it

22   beyond that date.

23            THE COURT:  Please.

24            MR. GROSS:  February of 2010 is what we discussed.

25            THE COURT:  A date in February?                      03:32
```

1          **THE CLERK:**  February 8, 2010, at 2:00 p.m.?

2          **MR. RAPHAEL:**  That's fine, Your Honor.

3          **MR. GROSS:**  That's fine, Your Honor.

4          **THE COURT:**  Very well.

5          That will be the date set for sentencing.          03:32

6          Anything further from the government at this time?

7          **MR. RAPHAEL:**  Nothing from the government,

8   Your Honor.

9          **THE COURT:**  Anything further from the defense?

10          **MR. GROSS:**  No, Your Honor.          03:32

11          **THE COURT:**  All right.  Good luck to you all.

12          **THE DEFENDANT:**  I have just one question, Your Honor.

13          **THE COURT:**  Yes, sir.

14          **THE DEFENDANT:**  Will you be here on February 9th?

15   I've been told that you --          03:33

16          **THE COURT:**  I may be here, but I won't be sitting in

17   this chair.

18          Good day, sir.

19          **THE DEFENDANT:**  You too, Your Honor.

20          (Proceedings conclude.)          03:33

21

22

23

24   / / /

25   / / /

1

2                                CERTIFICATE

3

4   I hereby certify that pursuant to section 753, title 28, United
    States Code, the foregoing is a true and correct transcript of
5   the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
6   conformance with the regulations of the Judicial Conference of
    the United States.

7

8   _____          _____
    THERESA A. LANZA, CSR, RPR                          Date
9   Federal Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25